**CORRECTED OPINION**

**PUBLISHED**

# UNITED STATES COURT OF APPEALS
### FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

JAMES RICHARD HACKLEY, IV, a/k/a
J.R., a/k/a Baby J,

*Defendant-Appellant.*

No. 10-4069

Appeal from the United States District Court
for the Western District of Virginia, at Harrisonburg.
Glen E. Conrad, District Judge.
(5:09-cr-00018-gec-1)

Argued: September 22, 2011

Decided: December 6, 2011

Corrected Opinion Filed: December 20, 2011

Before DUNCAN, DAVIS, and DIAZ, Circuit Judges.

---

Affirmed by published opinion. Judge Duncan wrote the opinion, in which Judge Davis and Judge Diaz joined.

---

2               UNITED STATES V. HACKLEY

## COUNSEL

**ARGUED:** Helen Eckert Phillips, MCGLOTHLIN AND
PHILLIPS, PPLC, Lebanon, Virginia, for Appellant. Jean
Barrett Hudson, OFFICE OF THE UNITED STATES
ATTORNEY, Charlottesville, Virginia, for Appellee. **ON
BRIEF:** Timothy J. Heaphy, United States Attorney, Roa-
noke, Virginia, Robert N. Tracci, Special Assistant United
States Attorney, OFFICE OF THE UNITED STATES
ATTORNEY, Charlottesville, Virginia, for Appellee.

## OPINION

DUNCAN, Circuit Judge:

James Richard Hackley ("Hackley") was convicted of sev-
eral offenses related to his sale of cocaine base to a govern-
ment informant and subsequent efforts to have that
informant—the lead witness in the government's case against
him—murdered. Hackley challenges his convictions, the join-
der of the charges into a single trial, the court's refusal to
grant him new counsel, and his sentence. Although the facts
in this case come perilously close to the lower boundary of
what we will accept as substantive evidence of a conspiracy
to distribute drugs, for the reasons discussed below, we
affirm.

I.

A.

David Jackson, a longtime crack user who had worked as
a confidential informant since 1994, brought Hackley to the
government's attention in May 2008. Jackson worked for a
tree service company and was out doing tree work in Win-
chester, Virginia on May 18, 2008, when he saw Hackley

drive up in a white vehicle. They had known each other since 1992, but had not seen each other for about a year. Jackson had never purchased cocaine from Hackley before, but knew from previous discussions with him that Hackley had sold cocaine in the past. They chatted about how they had been doing, and then Jackson asked Hackley if he had cocaine. At trial, this was how Jackson described their conversation:

A    . . . . I asked him if he was still getting cocaine.

Q.   Is that the word you used? Were you that specific?

A.   Yeah, yeah, yeah, still getting that shit, cocaine, and he said yeah. Then I asked him for an eight-ball. He told me I was lucky, he just come back from Maryland, pull over to the parking lot, and I bought some crack off of him.

Q.   Had you purchased crack cocaine from him in the past?

A.   No.

Q.   Prior to that you had never purchased cocaine from him?

A.   No.

Q.   Then why was it that you would have this conversation about crack cocaine?

A.   I've known the man since 1992. We've had discussions before, but I've never bought.

J.A. 170-71.

The purchase took place in Hackley's vehicle. After Jackson got into the vehicle, he pulled out $100 for the purchase

and saw Hackley reach underneath his seat and pull out a brown paper bag. Hackley pulled out a piece of crack cocaine that was approximately the size of "two golf balls" and "broke off a piece" for Jackson. J.A. 173-74.

That evening, Jackson contacted Agent Kevin Coffman, an officer with the Northwest Virginia Regional Drug Task Force whom Jackson had known for "a couple years." J.A. 67. Jackson told Coffman that he had purchased crack from Hackley earlier that day.

The government arranged for Jackson to make six controlled purchases from Hackley between May 20, 2008, and August 20, 2008. During these purchases, Hackley sold Jackson a total of 6.554 grams of cocaine base in the form of crack for $1,050. In addition, Jackson made unauthorized purchases of crack for his personal use. At some point that summer, Hackley explained to Jackson that he was receiving the cocaine from his "family" in Maryland.

B.

Hackley was arrested on August 20, 2008, and held at the Warren County Jail in Front Royal, Virginia. While incarcerated, he wrote letters to four different female friends in which he discussed paying Jackson not to testify or persuading him to lie. These letters expressed that he "would rather if [Jackson] did not show up," J.A. 589, and that "the only way out [of jail] is if [Jackson] don't show up," J.A. 608. He also spoke with his fellow inmate, Ray Johnson, about not wanting Jackson to appear in court. Hackley also told Johnson that he owned a .380-caliber handgun. While it is unclear whether Johnson or Hackley first proposed killing Jackson, at some point that topic arose. Hackley told Johnson that "David Jackson needed to be killed so he didn't show up" in court. J.A. 273. Johnson testified that Hackley's desire to have Jackson killed "was pretty set in stone." *Id.*

Unfortunately for Hackley, Johnson contacted federal agents and told them that Hackley was discussing having their witness killed. Johnson became a confidential informant and began cooperating with the government in its investigation of Hackley's murder for hire scheme.

With Johnson's cooperation, the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") sent Special Agent Leonard Codispot to pose as an inmate at the Warren County Jail. Johnson told Hackley that Codispot could help him have Jackson killed. Codispot testified that Hackley initiated a conversation by saying to him "I got a problem. I need this guy taken out. You know, he's testifying against me." J.A. 350.

Codispot testified that he asked Hackley if there was "a certain way he would like to have David Jackson killed," J.A. 277, asking, "Do you want me to stab him, cut his head off or shoot him with a gun?" J.A. 351-52. Hackley "didn't care how it was done, he just wanted Mr. Jackson gone forever." J.A. 352. Codispot asked him, "[D]o you want [me] to just take him away for a while and make him disappear for a little bit?" J.A. 351. Hackley said "no, he wanted him gone forever." J.A. 351.

Codispot also testified that Hackley mentioned that he had a gun hidden at Irvette Reaves's house that Codispot could "probably get," J.A. 351, but that he no longer had her phone number. Reaves was Hackley's girlfriend but apparently disassociated herself after seeing another woman with him in prison. Hackley wrote to tell her where the gun was hidden and to ask her to move it. Despite their falling out, Reaves moved the gun to her new home and kept it until agents searched her house on April 28, 2009.

Hackley offered Codispot $5,000 or his motorcycle in exchange for his help. He twice wrote to another girlfriend, Susie Dearing, asking her to have keys made for the bike and

telling her that Codispot was going to come inspect it. He asked Dearing to damage one of the keys to the bike so that it could not start it. Hackley wrote to Dearing that he was concerned that Codispot was going to try to cheat him. Johnson gave Dearing's address and phone number to Codispot so that he could inspect the motorcycle.

After Codispot left the jail, agents staged the death of Jackson, complete with a picture in a fake news story. According to Johnson, when Hackley was given a copy of the article, Hackley was "[e]cstatic." J.A. 291.

### C.

On April 22, 2009, a federal grand jury for the Western District of Virginia returned a seven-count indictment against Hackley. Count One charged Hackley with conspiracy to distribute five or more grams of cocaine base in violation of 21 U.S.C. §§ 841(b)(1)(B) and 846. Counts Two through Seven charged Hackley with distribution of crack in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(C).

The grand jury returned a superseding indictment on June 18, 2009. This indictment retained the original seven counts and added four additional charges: (1) murder for hire, in violation of 18 U.S.C. § 1958; (2) solicitation to commit murder for hire, in violation of 18 U.S.C. §§ 373 and 1958; (3) obstruction of justice, in violation of 18 U.S.C. § 1512(c)(2); and (4) felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1).

Hackley had entered into a plea agreement with the government on September 30, 2009, but sought to withdraw from that plea agreement on October 6, 2009, a little more than a week before trial. Hackley and his assigned attorney moved on October 6th for the court to appoint another lawyer to represent him. The district court denied this motion.

On October 8, 2009, Hackley filed a Motion for a Separate Trial on Count Eleven (felon in possession of a firearm). The district court denied this motion on October 15, 2009.

The government filed a Notice of Enhanced Punishment pursuant to 21 U.S.C. § 851 on October 9, 2009.

On October 19th and 20th, Hackley was tried before a jury in Charlottesville, Virginia. At trial, after the government rested, Hackley moved for a judgment of acquittal on Counts Nine (solicitation to commit murder for hire) and Eleven. The court denied the motion. Hackley requested a jury instruction on entrapment with respect to Count Eight—murder for hire—which the district court denied. On October 21, the jury found him guilty on all eleven counts. Thereafter, Hackley made a renewed motion for judgment of acquittal on Count Nine, and this time on Count One as well. The district court denied the motion on December 3, 2009.

On January 7, 2010, the district court sentenced Hackley to a term of 306 months in prison. The court calculated Hackley's criminal history as eight points, based on ten convictions, the oldest of which was a conviction in October 1992 for distribution and conspiracy to distribute cocaine. Offenses older than 15 years do not usually result in enhancements under U.S.S.G. Chapter 4, Part A § 4A1.2(e). The court, however, at the suggestion of the probation office in the presentence report ("PSR"), included Hackley's 1992 conviction because his incarceration continued until September 23, 1993, less than fifteen years before May 20, 2008. Including the 1992 conviction moved his criminal history from Category III to Category IV and increased the recommended sentence range under the Sentencing Guidelines from 262-327 months to 292-365 months. His 306-month sentence falls within both Sentencing Guidelines ranges.

## II.

Hackley now appeals the denial of his Motions for Judgment of Acquittal with respect to Counts One (conspiracy to

distribute) and Nine (solicitation to commit murder for hire),
the denial of an instruction on entrapment for Count Eight
(murder for hire), whether there was sufficient evidence to
convict him on Count Eleven (felon in possession of a fire-
arm), the district court's refusal to grant him a separate trial
on Count Eleven, its refusal to allow him to substitute counsel
before trial, and finally his sentence. We consider each in
turn.

### A.

Hackley appeals the district court's denial of his Motion for
Judgment of Acquittal with respect to Count One, conspiracy
to distribute and possess a controlled substance with intent to
distribute, in violation of 21 U.S.C. §§ 841(a)(1),
841(b)(1)(B), and 846. He argues that there is insufficient evi-
dence to support his conviction.

We review the district court's ruling on a motion for judg-
ment of acquittal de novo and will uphold the verdict if, view-
ing the evidence in the light most favorable to the
government, it is supported by substantial evidence. *United
States v. Alerre*, 430 F.3d 681, 693 (4th Cir. 2005). Substan-
tial evidence is "evidence that a reasonable finder of fact
could accept as adequate and sufficient to support a conclu-
sion of a defendant's guilt beyond a reasonable doubt." *Id.*
(internal quotation marks omitted). While acknowledging that
the evidence is indeed thin, we nonetheless affirm because we
must assume on appeal that the jury resolved any issues of
witness credibility in the government's favor. *See United
States v. Jeffers*, 570 F.3d 557, 565 (4th Cir. 2009). Nonethe-
less, we reiterate that this case represents the very boundary
of what passes for substantial evidence of a conspiracy.

In order to prove conspiracy in this case, "the government
was required to establish beyond a reasonable doubt that: '(1)
an agreement' to distribute and 'possess cocaine with intent
to distribute existed between two or more persons; (2) the

defendant knew of the conspiracy; and (3) the defendant knowingly and voluntarily became a part of this conspiracy.'" *United States v. Yearwood*, 518 F.3d 220, 225-26 (4th Cir. 2008) (quoting *United States v. Burgos*, 94 F.3d 849, 587 (4th Cir. 1996) (en banc)). Since Hackley does not appeal his convictions for the substantive crime of distribution of a controlled substance, the issue is whether there was sufficient evidence of an agreement to support the finding of conspiracy.

The presence of a knowing and voluntary agreement distinguishes conspiracy from the completed crime and is therefore an essential element of the crime of conspiracy. *See Iannelli v. United States*, 420 U.S. 770, 777 n.10 (1975); *Burgos*, 94 F.3d at 858. Conspirators need not know "all of the details of the conspiracy," provided that they know its "essential object." *United States v. Goldman*, 750 F.2d 1221, 1227 (4th Cir. 1984). This agreement need only be a "tacit or mutual understanding" between the defendant and his accomplice. *United States v. Ellis*, 121 F.3d 908, 922 (4th Cir. 1997). Circumstantial evidence alone is sufficient to support a conviction for conspiracy. *Ellis*, 121 F.3d at 922 (internal quotation marks omitted).

In *United States v. Townsend*, the Seventh Circuit held that, in drug conspiracy cases, "evidence of a buyer-seller relationship, standing alone, is insufficient to support a conspiracy conviction." 924 F.2d 1385, 1394 (7th Cir. 1991). Two years later, in *United States v. Mills*, we interpreted that holding, saying, "evidence of a buy-sell transaction is at least relevant (i.e. probative) on the issue of whether a conspiratorial relationship exists." 995 F.2d 480, 485 n.1 (4th Cir. 1993). Since then, we have held that evidence of a continuing buy-sell relationship when coupled with evidence of large quantities of drugs, or "continuing relationships and repeated transactions," creates a reasonable inference of an agreement. *United States v. Reid*, 523 F.3d 310, 317 (4th Cir. 2008) (citing *Burgos*, 94 F.3d at 858).

The government attempts to use this inference to prove that
Hackley conspired both with Jackson and with unnamed
Maryland suppliers. This, however, is not entirely accurate.
As the district court correctly instructed the jury, because
Jackson was at all relevant times a government agent, despite
his unauthorized purchases, he cannot be a co-conspirator.
*United States v. Lewis*, 53 F.3d 29, 33 (4th Cir. 1995). The
unnamed Maryland suppliers, then, are the only possible peo-
ple with whom Hackley could have had a conspiratorial
agreement.

Preliminarily, we note that in this case, the evidence of sub-
stantial quantities of drugs is, on its own, too thin to support
an inference of conspiracy. All of the evidence of the scale of
Hackley's drug-dealing comes from the two confidential
informants. Jackson testified that he saw Hackley with two
golf-ball sized quantities of crack. Johnson testified that he
"believed" Hackley sold "about an ounce or two a week." J.A.
269.

The government offered no testimony about how much
crack two golf-ball sized quantities would be, arguing instead
that the government need not prove the exact weights of
drugs. *See United States v. Natanel*, 938 F.2d 302, 312-13 (1st
Cir. 1991). While we do not disagree, if we are to infer the
existence of an agreement based on the drug quantity, it
would be helpful to have some sense of what that quantity is,
particularly when it appears limited.[1] Even the government
describes Jackson's authorized purchases as "relatively small
amounts."[2] Appellee's Br. 23. The cases on which the Gov-

---

[1] Because five grams was an element of the crime charged, even the dis-
trict judge was concerned that "the jury has to be given some understand-
ing as to how they're to decide what quantity of crack is involved." J.A.
543. The government responded that two golf-ball sized quantities are a
"substantial weight," but it could not be more specific than that. *Id.*

[2] One ounce is equivalent to 28.35 grams; Jackson made controlled pur-
chases totaling 6.5 grams of crack as well as unauthorized purchases of
unknown amounts.

ernment relies in support of this inference all involve larger quantities than those reflected here. *E.g.*, *Yearwood*, 518 F.3d at 226 (five ounces sold for $3,500 in a single transaction); *United States v. Parker*, 330 F. App'x 436, 438 (4th Cir. 2009) (100 kilograms sold over a 10-year period to multiple witnesses along the distribution chain). Of the cases on which the government relies, the smallest quantity contemplated is 4.5 ounces, but there witnesses testified that they were "repeat customers." *Reid*, 523 F.3d at 317.

Nonetheless, we are constrained to affirm because the government's evidence of "continuing relationships and repeated transactions," although sparse, is sufficient to support an inference of an ongoing relationship between Hackley and the unnamed Maryland suppliers. Three pieces of evidence, taken together, form the basis from which a jury could reasonably infer that Hackley had a continuous relationship with Maryland suppliers. The first is Jackson's testimony that Hackley told Jackson that he was getting his supply of crack from his "family" in Maryland. Supporting this testimony is Jackson's further observation that Hackley was able to sell crack when he returned from Maryland.

The second is Jackson's testimony that Hackley was "still" getting cocaine, that he had known Hackley since 1992, and that they had discussed crack cocaine previously. Although Jackson had not actually bought cocaine from Hackley before May 18, 2008, a reasonable jury could infer from this testimony that Hackley had previously received cocaine from his "family" in Maryland.

The third is a cryptic conversation between Hackley and Dearing in which they discussed his other girlfriend's desire that he "tell on" someone else so that he could get out. Appellee's Br. at 21;[3] Government Exhibit 58A. Hackley responded

---

[3]Although the government relies on this conversation between Dearing and Hackley, it neglected to include Exhibit 58A, which contains a tran-

that "[p]eople deal with me 'cause I'm not about all that bull-shit." *Id.* Hackley further explained to Dearing that not "tell-[ing] on" people was "the whole principle of the game." *Id.* Although she testified that she did not know what Hackley meant when he said "[p]eople deal with me," Dearing also testified that "the game" was "the drug game." J.A. 410-11.

From the totality of this evidence, we conclude that a jury could find beyond a reasonable doubt that Hackley had a continuous buy-sell relationship with Maryland suppliers. Under the test articulated in *Reid* and *Burgos* a jury could reasonably infer that Hackley had a standing agreement—a conspiracy—with unnamed Maryland suppliers to bring their drugs to market in Virginia.

It bears emphasis, however, that although there is ample evidence that Hackley distributed crack, the conspiracy evidence is far weaker.[4] The relatively small amount of drugs involved and the scant evidence of a buyer-seller relationship between Hackley and his suppliers in Maryland are the outer limits of that which could support an inference that a conspir-

---

script of the conversation, in the joint appendix or in any other filing initially made available to this court. Further complicating our efforts is that the government's brief refers to Exhibit 58A as Exhibit 59. The government's brief then cites to a portion of the trial transcript reflecting Dearing's testimony about what she understood during the conversation. Notably absent is a transcript of the conversation that the government quotes in its brief. We feel compelled to observe that incomplete records accompanied by mis-bound and mis-paginated briefs replete with inaccurate citations do not help our analysis.

[4]Many of the government's arguments rely on inferences more tenuous than we are willing to make. For example, the government argued during its closing argument that because Hackley told a confidential informant that he was paying out all of his legitimate income in child support, his other assets, like the motorcycle, must come from drug dealing. ECF No. 90 at 74:5-13. We need a more detailed accounting of Hackley's income and assets than the government offered at trial before we will allow payment of child support to become evidence of a conspiracy to distribute drugs.

acy existed. Distribution and conspiracy remain separate offenses, and although we certainly allow the government to use circumstantial evidence to prove the presence of an agreement—the sole element distinguishing conspiracy from the substantive crime—the government must take care not to ask the jury to infer an agreement based on guilt of distribution alone.[5]

### B.

Next, we address whether the district court erred when it denied Hackley a jury instruction on entrapment. The affirmative defense of entrapment has two parts: "government inducement of the crime, and a lack of predisposition on the part of the defendant to engage in the criminal conduct." *Mathews v. United States*, 485 U.S. 58, 63 (1988); *see also United States v. Ramos*, 462 F.3d 329, 334 (4th Cir. 2006). "As a general proposition, a defendant is entitled to an instruction as to any recognized defense for which there exists evidence sufficient for a reasonable jury to find in his favor." *Mathews*, 485 U.S. at 63. We review de novo a district court's denial of a jury instruction on entrapment. *Ramos*, 462 F.3d at 334.

The district court is the gatekeeper; if the defendant does not produce "more than a scintilla of evidence of entrapment," the court need not give the instruction. *United States v. Phan*,

---

[5]In its closing argument, the government said, "[y]ou also heard evidence when the defendant was returning to Maryland, he had two golf-ball sized portions of crack cocaine. Is it even possible that the defendant didn't agree with someone when he obtained these drugs to sell them to someone else?" ECF No. 90 at 12:17-21. This reasoning effectively reads the element of agreement out of the crime of conspiracy. Without this element, anyone guilty of distributing a controlled substance would be guilty of conspiracy to distribute unless the defendants could prove, as an affirmative defense, that they found, stole, or made the drugs themselves. A paradigm in which two different crimes have identical elements would allow the government to punish the defendant for the same offense twice.

121 F.3d 149, 154 (4th Cir. 1997). This circuit has repeatedly held that "solicitation of the crime alone is not sufficient to grant the instruction, as that 'is not the kind of conduct that would persuade an otherwise innocent person to commit a crime.'" *Ramos*, 462 F.3d at 334 (quoting *United States v. Hsu*, 364 F.3d 192, 200 (4th Cir. 2004)).

Hackley argues that he has asserted "more than a mere scintilla of evidence of entrapment." He claims that a reasonable jury could conclude that Johnson, not Hackley, initiated the discussion of murder, and that his earlier plan was to pay Jackson not to testify. Who started the conversation is irrelevant. His argument founders on the fact—which he does not dispute—that Johnson was not a government informant at the time that the discussions about doing away with Jackson began. Entrapment only arises in the context of *government* inducement.

Moreover, there is ample evidence in the record from which the jury could find that Hackley was predisposed to prevent Jackson from testifying. In addition to his discussions with Johnson, Hackley wrote numerous letters to his girlfriends about his desire to prevent Jackson from testifying. "Predisposition is not limited only to crimes specifically contemplated by the defendant prior to government suggestion." *Ramos*, 462 F.3d at 334-45 (internal citations omitted). Instead, "[i]t is sufficient if the defendant is of a frame of mind such that, once his attention is called to the criminal opportunity, his decision to commit the crime is the product of his own preference and not the product of government persuasion." *United States v. Osborne*, 935 F.2d 32, 38 (4th Cir. 1986). Such was clearly the case here.

## C.

Hackley appeals the district court's denial of his Motion for Judgment of Acquittal as to Count 9, solicitation to commit

UNITED STATES V. HACKLEY                          15

murder for hire, in violation of 18 U.S.C. §§ 373 and 1958.[6] Section 1958 criminalizes using the mail or other interstate commerce facilities "with intent that a murder be committed in violation of the laws of any State or the United States" for pecuniary gain.[7] Section 373 makes it a crime to solicit any-one, including a government agent, to commit a crime of vio-lence. Hackley claims that there was insufficient evidence to show that he used the mail or other interstate commerce facili-ties while soliciting Codispot to kill Jackson. We disagree.

The record clearly shows that Hackley wrote to his many girlfriends seeking help in his murder for hire scheme. For example, he wrote to Dearing instructing her to show Codis-

_____

[6]With respect to Count 9, Hackley also argues that the government's evidence amounts to a constructive amendment of the indictment. "A con-structive amendment to an indictment occurs when either the government (usually during its presentation of evidence and/or its argument), the court (usually through its instructions to the jury), or both, broadens the possible bases for conviction beyond those presented by the grand jury." *United States v. Floresca*, 38 F.3d 706, 710 (4th Cir. 1994) (en banc). Hackley argues the indictment was constructively amended because the jury could have relied on 18 U.S.C. § 1512(a)(1)—which makes it unlawful to "kill[ ] or attempt[ ] to kill another person, with intent to," for example, "prevent the attendance or testimony of any person in an official proceeding"—as a predicate offense under 18 U.S.C. § 373, even though the only permissi-ble predicate offense charged in the indictment was 18 U.S.C. § 1958, the murder-for-hire statute. It is true that in a separate count of the indictment, Count 10, Hackley was charged with a substantive violation of 18 U.S.C. § 1512(a)(1), and the jury was instructed and convicted Hackley on that count. But the district court specifically instructed the jury that, on Count 9, the only applicable predicate offense for a violation of 18 U.S.C. § 373 was § 1958, not § 1512(a)(1). Therefore, there was no constructive amend-ment of the indictment.

[7]Hackley also argues that 18 U.S.C. § 1512(c)(2) is not a proper predi-cate offense under 18 U.S.C. § 373. The jury, however, was not instructed that 18 U.S.C. § 1512(c)(2) is a predicate offense. Rather, the district court agreed with Hackley that only the murder-for-hire statute, not the obstruction-of-justice statute, constituted a proper predicate offense, and instructed the jury that Hackley could be convicted of violating 18 U.S.C. § 373 only if it found that Hackley had solicited Codispot to commit mur-der for hire in violation of 18 U.S.C. § 1958.

pot the motorcycle. While it is true that Hackley did not write or call Codispot himself, § 1958 simply says "use the mail . . . with intent that a murder be committed." We have never held that § 1958 requires that defendants mail the person whom they solicit, nor does the statute support such a limited reading. Since Hackley's letters to Dearing facilitated his solicitation of Codispot, we affirm.

### D.

Hackley makes two claims with respect to Count Eleven: first, that there was insufficient evidence to convict him of being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g); and second, that the district court erred by denying his motion for a separate trial on this count. We discuss each in turn.

### 1.

As discussed above, "[w]hen reviewing a sufficiency-of-the-evidence claim, we will sustain the jury's verdict 'if there is substantial evidence, taking the view most favorable to the Government, to support it.'" *United States v. Jackson*, 124 F.3d 607, 610 (4th Cir. 1997) (quoting *Glasser v. United States*, 315 U.S. 60, 80 (1942)). "Substantial evidence is evidence that a reasonable finder of fact could accept as adequate and sufficient to support a conclusion of a defendant's guilt beyond a reasonable doubt." *Id.* (quoting *Burgos*, 94 F.3d at 862). Since Hackley stipulated that he was a felon, the only issue is whether he possessed a firearm.

A convicted felon is guilty under § 922(g) if he "exercised . . . dominion and control over" a firearm. *Jackson*, 124 F.3d at 610 (internal quotation marks omitted). Hackley claims that he could not have exercised dominion or control over the firearm because he was incarcerated. We need not reach this issue because the indictment charged him with possessing the firearm "on or between August 19, 2008 and August 28,

2008." J.A. 22. Hackley was not arrested until August 20, 2008.

Before his arrest, Hackley purchased the gun and stored it at Irvette Reaves's house. She testified that she did not know it was there until he found out that she was moving and asked her to bring it to her new house. Hackley also wrote to her from prison to inquire about what she had done with his "toy." Since a jury could infer from this evidence that Hackley possessed the gun on August 19th, before he was arrested, we affirm.

### 2.

Hackley also claims that joinder of Count Eleven with the other counts in the indictment was improper and that trial on all counts together prejudiced him. Neither claim has merit. "Whether offenses in an indictment are improperly joined under Rule 8(a) is a question of law reviewed de novo." *United States v. Cardwell*, 433 F.3d 378, 384-85 (4th Cir. 2007). We review the district court's decision not to sever the offenses for abuse of discretion. *United States v. Acker*, 52 F.3d 509, 514 (4th Cir. 1995)

### a.

An indictment "may charge a defendant in separate counts with [two] or more offenses if [1] the offenses charged . . . are of the same or similar character, . . . [2] are based on the same act or transaction, or [3] are connected with or constitute parts of a common scheme or plan." Fed. R. Crim. P. 8(a). Under this court's decision in *Cardwell*, counts are properly joined if they "are based on the same act or transaction" or "are connected with or constitute parts of a common scheme or plan" such that they "have a logical relationship to one another." 433 F.3d at 385 (internal quotation marks omitted). This test permits broad joinder to promote efficiency, but does not per-

mit stretching the statute to cover offenses that are only related temporally. *Id.* at 386.

In *Cardwell*, we held that a felon in possession charge was not necessarily related to a charge of murder for hire when the gun was not intended to be part of the crime, unless there exist "additional facts demonstrat[ing] that the crimes were logically related to one another." *Id.* at 387 (emphasis omitted). We held that the defendant's statement that he would have used the gun to avoid arrest for murder for hire was sufficient to make joinder of the charges proper. *Id.* Here Hackley not only possessed the gun that was to be used in the crime; he offered that exact gun for the undercover agent to use to murder Jackson. If contemplating using a gun to avoid arrest for murder for hire shows a sufficient relationship for joinder then surely contemplating using a gun in the murder for hire is also sufficient. That Hackley did not make an "effort to actually use" the gun, and that he was incarcerated during the relevant time period, does not render the relationship any less logical. For these reasons, we hold that Count Eleven was permissibly joined with the other charges.

b.

In the alternative, Hackley argues the district court erred when it declined to sever Count Eleven for a separate trial because its inclusion prejudices him. Federal Rule of Criminal Procedure 14(a) gives courts discretion to sever offenses if joinder in a single trial would prejudice a defendant. It is not enough for the defendant to show that severance offers him "a better chance of acquittal." *United States v. Reavis*, 48 F.3d 763, 767 (4th Cir. 1995) (internal quotation marks omitted). The Supreme Court has held that severance is appropriate "only if there is a serious risk that a joint trial would . . . prevent the jury from making a reliable judgment about guilt or innocence." *Zafiro v. United States*, 506 U.S. 534, 539 (1993) (joinder of defendants). Similarly, we have held that "[t]he trial court has a wide range of discretion in matters of sever-

ance which should be left undisturbed, absent a showing of clear prejudice or abuse of discretion." *Acker*, 52 F.3d at 514. Hackley has shown neither clear prejudice nor abuse of discretion.

Hackley claims that knowing about his prior felony conviction would prejudice jurors when considering the other counts. In *Cardwell*, which as we noted also involved § 922(g) and a murder-for-hire charge, we opined that "stipulat[ing] to the existence of the prior felony[, and k]eeping the facts about the felony (if not the fact of the felony) from the jury tends to diffuse any passions that would be aroused by specific evidence of the defendant's felonious past." 433 F.3d at 388 (emphasis omitted). The district court in this case allowed precisely such a stipulation, which prevented the jury from hearing any details about the prior conviction. Moreover, evidence of Hackley's possession of a gun would have been admissible on the murder-for-hire and drug distribution charges, because in Hackley's conversations with Johnson and Codispot he stated that he had a gun that Codispot could use to murder Jackson. Accordingly, the district court did not abuse its discretion when it declined to sever Count Eleven.

E.

Hackley claims that the district court abused its discretion when it denied his Motion for Change of Counsel. While the Sixth Amendment includes the right to counsel of one's own choosing, this right is not absolute and "must not obstruct orderly judicial procedure and deprive courts of the exercise of their inherent power to control the administration of justice." *United States v. Gallop*, 838 F.2d 105, 108 (4th Cir. 1988). We review denials of motions to substitute counsel for abuse of discretion, considering (1) "the timeliness of the motion"; (2) "the adequacy of the court's inquiry into the defendant's complaint"; and (3) "whether the attorney/client conflict was so great that it had resulted in total lack of com-

munication preventing an adequate defense." *United States v. Mullen*, 32 F.3d 891, 895 (4th Cir. 1994) (internal quotation marks omitted).

Considering the timeliness of Hackley's motion under *Mullen*'s first prong, we note that Hackley moved for new counsel when he withdrew from his plea agreement just one week before trial. The trial had already been delayed once. Although the district court did not specifically find the motion untimely, it expressed concern about future delay, especially since Hackley's was "one of the oldest criminal cases" and that "the better course would be to go ahead and try it." J.A. 40-41.

Looking to the second *Mullen* factor, Hackley alleges that the district court failed to investigate the breakdown in communication between him and his attorney. That assertion is not borne out by the record. The district court inquired about Hackley's complaints and asked his attorney whether she had any problems with the representation. The attorney responded that she was not moving to withdraw. Hackley's complaint was that they had disagreements and that "she was not representing [him] to her full ability." J.A. 38. However, he gave no basis for his expectations, nor did he specify what counsel should have been doing that she was not. Again, we cannot agree that the district court failed to investigate his complaint.

Nor did there appear to be such a breakdown in communication as to prevent Hackley from receiving an adequate defense. He complained that his counsel's advice was "wishy-washy," but Hackley changed his own mind about how to plead. J.A. 39. He may not have liked her style, but he has not suggested that counsel's representation was inadequate. Therefore, we affirm.

F.

The final issue Hackley raises is whether the district court abused its discretion by improperly considering his prior fel-

ony conviction when calculating his sentence. In reviewing any sentence, "whether inside, just outside, or significantly outside the Guidelines range," we apply a "deferential abuse-of-discretion standard." *Gall v. United States*, 552 U.S. 38, 41 (2007). We must first consider whether the district court committed any procedural error and then "[i]f, and only if, we find the sentence procedurally reasonable can we consider the substantive reasonableness of the sentence imposed under an abuse-of-discretion standard." *United States v. Carter*, 564 F.3d 325, 328 (4th Cir. 2009) (internal quotation marks omitted).

Procedural errors include treating the Guidelines as mandatory, failing to calculate (or improperly calculating) the Guidelines range, selecting a range based on clearly erroneous facts or failing to explain the sentence chosen. *See Gall*, 552 U.S. at 51; *see also Rita v. United States*, 551 U.S. 338, 356 (2007). "Substantive reasonableness examines the totality of the circumstances to see whether the sentencing court abused its discretion in concluding that the sentence it chose satisfied the standards set forth in 18 U.S.C. § 3553(a)." *United States v. Mendoza-Mendoza*, 597 F.3d 212, 216 (4th Cir. 2010). A sentence within a properly calculated guideline range is presumptively reasonable. *Rita*, 551 U.S. at 351.

The district court adopted the PSR's calculation of Hackley's criminal history as eight points. The PSR based this calculation on his ten prior convictions, the oldest of which was a conviction in October 1992 for distribution and conspiracy to distribute cocaine. Including the October 1992 conviction added three points to the total and bumped Hackley's criminal history category from III (and a recommended range of 262 to 327 months) to IV (and a recommended range of 292 to 365 months). Hackley does not argue that including the conviction was a procedural error. Indeed, although ordinarily a prior conviction only counts toward a defendant's criminal history if the sentence on the conviction was "imposed within fifteen years of the defendant's commencement of the instant

offense," convictions imposed earlier are also counted if the sentence exceeded one year and one month and "resulted in the defendant being incarcerated during any part of such fifteen-year period." U.S.S.G. § 4A1.2(e). Hackley was not released from prison on the October 1992 conviction until September 23, 1993, less than fifteen years before May 20, 2008. Because the Guidelines range was properly calculated, and because the sentence imposed (306 months) is within that range, we are "allowed to presume that [the] district court's chosen sentence is substantively reasonable." *Mendoza-Mendoza*, 597 F.3d at 216.

Hackley argues the 306-month sentence was "greater than necessary" and therefore the district court's refusal to depart downward rendered the sentence substantively unreasonable because (1) criminal history points are not "ordinarily" assigned for "convictions older than 15 years", (2) "the 1992 conviction is the only [prior] conviction with a . . . substantial jail sentence," and (3) Hackley only served a year and a half in jail for the 1992 conviction. Appellant's Br. 45. A district court has discretion to depart downward "[i]f reliable information indicates that the defendant's criminal history category substantially over-represents the seriousness of the defendant's criminal history or the likelihood that the defendant will commit other crimes." U.S.S.G. § 4A1.3(b)(1). However, "[w]e lack the authority to review a sentencing court's denial of a downward departure unless the court failed to understand its authority to do so." *United States v. Brewer*, 520 F.3d 367, 371 (4th Cir. 2008). Hackley does not argue, and the record does not disclose, that the district court failed to recognize its authority to depart downward. For these reasons, we decline to disturb his sentence.

III.

For the foregoing reasons, we affirm the judgment of the district court.

*AFFIRMED*